[No. 46347-4-II.   Division Two.   April 12, 2016.]

FEARGHAL MCCARTHY ET AL., *Appellants*, v. CLARK COUNTY ET AL., *Respondents*.

316

318

*Fearghal McCarthy*, pro se.

*Erin C. Sperger* (of *Erin Sperger PLLC*), for appellants.

*Anthony F. Golik, Prosecuting Attorney*, and *Taylor R. Hallvik, Deputy*, for respondent Clark County.

*E. Bronson Potter, City Attorney*, and *Daniel G. Lloyd, Assistant*, for respondent City of Vancouver.

*Robert W. Ferguson, Attorney General, Allison M. Croft, Managing Assistant*, and *Suzanne M. Liabraaten, Assistant*, for respondent Department of Social and Health Services.

¶1 MAXA, A.C.J. — Fearghal McCarthy and his sons, CPM and CCM, appeal the trial court's dismissal on summary judgment of their multiple claims against Clark County, the Department of Social and Health Services (DSHS), and the city of Vancouver arising from a report by

Fearghal's then wife Patricia McCarthy[1] that he had struck two-year-old CCM on the head. Based on the report, a Clark County deputy sheriff arrested Fearghal, DSHS investigated for possible child abuse, and Vancouver prosecuted criminal charges. Patricia later admitted that her report was false.

¶2 Fearghal, CPM, and CCM filed suit against Clark County, DSHS, and Vancouver. Their primary claim was that all three defendants negligently conducted investigations required under RCW 26.44.050 of Patricia's report that Fearghal had struck CCM, which resulted in Fearghal and the children being separated for an extended period. Fearghal and CPM/CCM also asserted several other causes of action against one or more of the defendants. The trial court granted summary judgment in favor of all three defendants on all claims.

¶3 In the published portion of this opinion, we hold that the trial court properly granted summary judgment on the negligent investigation claims under RCW 26.44.050. In the unpublished portion of this opinion, we hold that the trial court properly granted summary judgment on the remainder of Fearghal's and CPM/CCM's claims. Accordingly, we affirm the trial court's grant of summary judgment in favor of Clark County, DSHS, and Vancouver on all claims.

FACTS

¶4 Fearghal and Patricia married in 1998 and had two sons: CPM, born in 1999, and CCM, born in 2003.

*Patricia's Report of Abuse and Deputy Kingrey's Investigation*

¶5 On the afternoon of June 3, 2005, Patricia called 911 from her church to report that Fearghal had struck CCM on

---

[1] Because they have the same last name, we refer to Fearghal McCarthy and Patricia McCarthy by their first names. We mean no disrespect.

the head twice the prior evening, knocking him to the floor. Deputy Ed Kingrey of the Clark County Sheriff's Office was the responding officer.

¶6 Kingrey did not meet Patricia in person, but he spoke with her about the incident over the phone. Patricia told Kingrey that over the past year Fearghal had been physically and emotionally abusive to her and her small boys, and that a week earlier he had shoved her and grabbed her by the neck in a fit of rage. Patricia said that the previous evening CCM was crying "Mommy, mommy" during dinnertime and Fearghal told her to "make him shut-up o[r] else I will." Clerk's Papers (CP) at 241. According to Patricia, when CCM continued to cry Fearghal whacked him twice on the head, causing CCM to hit his head on the table and fall off of his chair onto the floor. Kingrey asked Patricia if CCM had any injuries, and she said that there were no visible marks.

¶7 Kingrey also talked with Patricia's mother, Regina Greer, over the phone. Greer said that CPM had told her that he had seen Fearghal physically abuse Patricia and had told her about the incident when Fearghal hit CCM. Kingrey did not ask to speak with CPM, who at that time was five years old. He also did not ask to examine CCM for injuries.

¶8 Kingrey went to the McCarthys' residence and spoke with Fearghal in person. Fearghal denied that the incident had happened and denied striking CCM. According to Fearghal, he told Kingrey that Patricia was abusing pain medications and had been high on prescription medications the night before, that she had been reporting delusions in the last year since her sister committed suicide, and that she was taking medication for anxiety and other mental health issues. He also showed Kingrey the various prescription medications that Patricia was taking. Fearghal submitted declarations stating that Kingrey was dismissive and refused to listen to his attempts to explain Patricia's history of anxiety, panic attacks, and drug use, and that Kingrey let

him know that the information he provided about Patricia did not matter.

### Fearghal's Arrest and First No-Contact Order

¶9 Kingrey arrested Fearghal for fourth degree assault–domestic violence against both CCM and Patricia and booked him into jail. Kingrey subsequently submitted a declaration of probable cause to support his arrest of Fearghal without a warrant. The declaration recited what Patricia had told him about Fearghal's assault of her and the incident where he struck CCM, and Greer's statement that CPM had told her that he had seen Fearghal strike Patricia and CCM. The declaration stated that Fearghal had denied abusing any member of his family, but it did not mention Fearghal's statements that Patricia had been high on prescription medications on the night of the incident or that she had been reporting delusions and was taking medication for mental health issues. The declaration also did not state that there was no physical evidence that Fearghal had hit CCM. Based on Kingrey's declaration, the district court found there was probable cause to arrest.

¶10 On June 6, the district court arraigned Fearghal on the fourth degree assault charges. At the arraignment, the district court issued a no-contact order because domestic violence was involved. The order prevented Fearghal from having any contact with CCM, including by telephone and writing, and prohibited him from coming within 500 feet of CCM's residence and day care. This order remained in effect until March 20, 2006.

### Investigation of Child Protective Services

¶11 The day after Fearghal's arrest, Greer took CCM to the emergency room. She told the doctor about Fearghal hitting CCM, and the doctor referred the incident to Child Protective Services (CPS). The case was assigned to social worker Patrick Dixson for investigation.

¶12 On June 13, Dixson met with Patricia, and she told him about Fearghal hitting CCM on June 2 and other inci-

dents of abuse. Patricia agreed to a voluntary safety plan suggested by Dixson. The safety plan provided that Patricia would (1) not allow Fearghal to have contact with the children until the no-contact order was lifted, (2) seek domestic violence counseling, and (3) keep the children safe from domestic violence.

¶13  Dixson claimed that he also met with CPM and CCM when he met with Patricia. However, CPM said he did not remember meeting Dixson and CCM's day care records indicate that CCM was at day care at the time of the alleged meeting. Dixson did not speak to Fearghal during his investigation because he believed Fearghal was out of the country and also that interviewing him would interfere with the law enforcement investigation.

¶14 Dixson did not receive any further information about the incident after his meeting with Patricia on June 13. However, he did not issue a report concerning his investigation for another 10 months. Dixson finally closed his investigation on April 12, 2006, concluding that the initial referral was "founded," and sent his report to his supervisor.

### Initial Involvement of City Attorney Petty

¶15  After Fearghal's arrest for fourth degree assault, the case was assigned to Vancouver assistant city attorney Jill Petty, who was part of the Domestic Violence Prosecution Center (DVPC). Petty first contacted Patricia about the case on June 6, 2005. Petty had a few phone calls and one face-to-face meeting with Patricia. Patricia claims that in those conversations she told Petty that she "was reticent about the allegations within the police report and wanted to recant." CP at 411. Patricia claims that Petty pressured her into cooperating by making various threats, including telling Patricia that if she recanted she likely would lose custody of the children in a dissolution action, Petty would notify CPS and they would take away her children, and Patricia would be prosecuted for making a false police report.

¶16 Patricia also claims that Petty told her to file a petition for a protection order that would eject Fearghal from the family home and prevent him from seeing the children, and that Petty encouraged her to file for a divorce.

¶17 On July 8, Petty filed an information in district court charging Fearghal with fourth degree assault—domestic violence against CCM.

## *Superior Court Protection Order*

¶18 On July 28, Patricia petitioned the superior court for a temporary protection order requiring Fearghal to vacate the family home and prohibiting Fearghal from contacting her, CPM, and CCM. The superior court issued the temporary protection order. The original order was to be in effect until August 10, but was extended until August 31. DSHS was not involved in this proceeding.

## *Temporary Mutual Restraining Order*

¶19 On August 9, Patricia filed a petition for dissolution of her marriage with Fearghal. On August 31, the family court entered a temporary mutual restraining order preventing Fearghal from contacting Patricia and preventing Patricia from contacting Fearghal.[2] The restraining order allowed Fearghal limited supervised contact with CPM.

¶20 The restraining order prohibited both Fearghal and Patricia from "assaulting, harassing, molesting or disturbing the peace of the other party or of any child" and from "going onto the grounds of or entering the home of the other party." The restraining order also indicated that violation of the order was a criminal offense under chapter 26.50 RCW and would subject the violator to arrest. DSHS was not involved in this proceeding.

---

[2] The record is unclear regarding how long the restraining order actually remained in effect. The original order expired after one year, but the parties and law enforcement treated the restraining order as in effect after August 31, 2006.

*Patricia's Report of Fearghal's No-Contact Order Violations*

¶21 Patricia claims that Petty asked her about what other criminal charges could be filed against Fearghal. Petty told her that the more charges that were filed against him, the easier it would be to convict him and have him deported because he was not a United States citizen. Petty also told Patricia to obtain and bring to her fitness club records to show that Fearghal had violated the no-contact order by going to a fitness club when Patricia was there with the children. Then Petty directed Patricia to report the violation.

¶22 On August 12, Patricia reported to the police that Fearghal had violated the June 6 no-contact order three times. Vancouver Police Officer Kortney Langston took Patricia's report and forwarded his report to the DVPC. On November 10, Petty filed new charges against Fearghal for the three violations of the no-contact order.

*Fearghal's Second No-Contact Order*

¶23 On December 8, the district court in the criminal action entered a domestic violence no-contact order preventing Fearghal from coming within 250 feet of CCM's residence for five years. This no-contact order remained in effect until terminated on October 6, 2006.

*CPM's Denial of Abuse*

¶24 On January 11, 2006, Petty and Fearghal's criminal defense attorney jointly interviewed CPM. CPM was emphatic that Fearghal did not hit CCM. There is no indication that this information was conveyed to DSHS at this time.

*Additional Charges and Transfer to Superior Court*

¶25 Patricia reported to law enforcement that Fearghal had given her a three-page letter with detailed instructions for her to follow to help him have the charges dropped. The letter included instructions that Patricia delete emails from

Fearghal and use a calling card to contact him. It also included a detailed account of Fearghal's version of events and how Patricia should align her story with his. A Vancouver detective investigated and forwarded her report to the DVPC with the recommendation that Fearghal be charged with witness tampering.

¶26 Petty transferred the case to the Clark County Prosecuting Attorney's Office to charge Fearghal with felony witness tampering. On January 31, the prosecutor filed an amended information charging Fearghal with witness tampering and fourth degree assault–domestic violence of CCM in the superior court.

¶27 On March 20, the district court dismissed Fearghal's fourth degree assault charge and rescinded the initial no-contact order that had been issued when Fearghal was arraigned.

*Dissolution Restraining Order*

¶28 On February 15, the superior court commissioner handling the dissolution action issued an order terminating all contact between Fearghal and CPM until further notice by the court. DSHS was not involved in this proceeding.

*Fearghal's Third No-Contact Order*

¶29 On February 21, the superior court in Fearghal's new criminal case entered a pretrial domestic violence no-contact order preventing Fearghal from coming within 500 feet of Patricia's or CCM's residence, school, or place of employment for two years.

*"Founded" Finding by DSHS*

¶30 On April 21, Dixson's supervisor sent Fearghal a letter informing him that the investigation concluded that the allegation that Fearghal struck CCM was "founded." Fearghal appealed the finding on May 8. In June, a DSHS area administrator reviewed Fearghal's appeal, and upheld the "founded" finding.

*Fearghal's Guilty Plea and Fourth No-Contact Order*

¶31 Fearghal eventually agreed to plead guilty to a reduced charge of disorderly conduct. On August 1, Fearghal entered a guilty plea to disorderly conduct for the incident with CCM. He was sentenced to 15 days in custody with credit for four days served, and with the remainder to be served on a work crew.

¶32 The superior court entered a postconviction domestic violence no-contact order as a result of Fearghal's disorderly conduct conviction. The order prohibited Fearghal from coming within 500 feet of the residence, school, or place of employment of Patricia or CCM for two years. This no-contact order remained in effect until April 6, 2007.

*"Inconclusive" Finding by DSHS*

¶33 In October 2006, the same DSHS area administrator who had upheld the "founded" finding revised the finding to "inconclusive." The change was made in light of new information provided by Fearghal, including that CPM stated that Fearghal had not hit CCM, indications that Patricia had coached CPM, new information that called into question Patricia's credibility, and Fearghal's plea deal that reduced the fourth degree assault to disorderly conduct.

*Rescission of Fourth No-Contact Order*

¶34 On April 6, 2007, the superior court rescinded its August 1, 2006 postconviction domestic violence no-contact order. The superior court entered a new order that imposed prohibitions only with respect to Patricia.

*Custody Issues Resolved*

¶35 In October 2008, Patricia and Fearghal agreed to a parenting plan making Fearghal the primary parent and sole decision-maker. In a lengthy "Stipulated Findings of Fact" drafted and signed by Patricia and Fearghal in their

dissolution proceeding, Patricia admitted to fabricating allegations against Fearghal, including the June 3, 2005 report that Fearghal had struck CCM.

*Procedural History*

¶36 Fearghal and CPM/CCM filed suit against Clark County, DSHS, and Vancouver in August 2008. The complaint asserted multiple causes of action on behalf of both Fearghal and CPM/CCM.

¶37 The defendants filed several summary judgment motions during the litigation, and the trial court eventually entered orders granting summary judgment in favor of all defendants and dismissing all claims. Fearghal and CPM/CCM appeal the summary judgment orders.

## ANALYSIS

¶38 Fearghal and CPM/CCM allege that questions of fact exist as to whether Clark County, DSHS, and Vancouver conducted negligent investigations of Patricia's report that Fearghal struck CCM, which resulted in Fearghal being separated from his children. We hold that (1) questions of fact exist as to whether Kingrey was negligent in his investigation, but Clark County is not subject to liability under RCW 26.44.050 because Kingrey's alleged negligence did not result in a "harmful placement decision"; (2) questions of fact exist as to whether Dixson was negligent in his investigation, but DSHS is not subject to liability under RCW 26.44.050 because Fearghal failed to show that Dixson's alleged negligence was the proximate cause of any harmful placement decision; and (3) Petty has prosecutorial immunity and therefore Vancouver is not subject to liability under RCW 26.44.050 because Fearghal failed to create a genuine issue of material fact regarding whether Petty acted outside her role as a prosecutor.

A. Standard of Review

¶39 We review a trial court's order granting summary judgment de novo. *Lyons v. U.S. Bank Nat'l Ass'n*, 181

Wn.2d 775, 783, 336 P.3d 1142 (2014). We review the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *Lakey v. Puget Sound Energy, Inc.*, 176 Wn.2d 909, 922, 296 P.3d 860 (2013).

■ ¶40 Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. CR 56(c). A genuine issue of material fact exists where reasonable minds could differ on the facts controlling the outcome of the litigation. *Dowler v. Clover Park Sch. Dist. No. 400*, 172 Wn.2d 471, 484, 258 P.3d 676 (2011). If reasonable minds can reach only one conclusion on an issue of fact, that issue may be determined on summary judgment. *Failla v. FixtureOne Corp.*, 181 Wn.2d 642, 649, 336 P.3d 1112 (2014), *cert. denied*, 135 S. Ct. 1904 (2015).

B. Negligent Investigation – Legal Principles

■■ ¶41 RCW 26.44.050 provides that law enforcement and DSHS must investigate reports of abuse or neglect of a child:

> [U]pon the receipt of a report concerning the possible occurrence of abuse or neglect, the law enforcement agency or the department of social and health services must investigate and provide the protective services section with a report in accordance with chapter 74.13 RCW, and where necessary to refer such report to the court.

Based on this statutory duty, parents and children have an implied cause of action against law enforcement and DSHS for negligent investigation under certain circumstances. *M.W. v. Dep't of Soc. & Health Servs.*, 149 Wn.2d 589, 595, 70 P.3d 954 (2003). This cause of action extends to parents who are suspected of abusing their children. *Tyner v. Dep't of Soc. & Health Servs.*, 141 Wn.2d 68, 82, 1 P.3d 1148 (2000).

■ ■ ¶42 The negligent investigation cause of action based on RCW 26.44.050 is a "narrow exception" to the rule

that there is no general tort claim for negligent investigation. *M.W.*, 149 Wn.2d at 601. A negligent investigation claim is available only when law enforcement or DSHS conducts an incomplete or biased investigation that "resulted in a harmful placement decision." *Id.* A harmful placement decision includes "removing a child from a nonabusive home, placing a child in an abusive home, or letting a child remain in an abusive home." *Id.* at 602. This "harmful placement decision" requirement is strictly applied. *See Roberson v. Perez*, 156 Wn.2d 33, 46-47, 123 P.3d 844 (2005) (rejecting a "constructive placement" argument and holding no harmful placement decision occurred when parents voluntarily sent child to live with grandparents during abuse investigation).

¶43 To prevail on a negligent investigation claim, the claimant must prove that the faulty investigation was a proximate cause of the harmful placement. *Petcu v. State*, 121 Wn. App. 36, 56, 86 P.3d 1234 (2004); *see also Tyner*, 141 Wn.2d at 82. Proximate cause has two elements: cause in fact and legal causation. *Tyner*, 141 Wn.2d at 82. Cause in fact exists when "but for" the defendant's actions, the claimant would not have been injured. *Id.* Cause in fact generally is a jury question. *Id.* Legal causation involves a policy determination as to how far the consequences of an act should extend and generally is a legal question.[3] *Id.*

¶44 A negligent investigation may be the cause in fact of a harmful placement even when a court order imposes that placement. *Id.* at 83. Liability in this situation depends upon what information law enforcement or DSHS provides to the court. *Id.* at 86, 88. A court order will act as a superseding cause that cuts off liability "only if all

---

[3] Fearghal and CPM/CCM argue that we should apply the substantial factor test to evaluate proximate cause. The respondents argue that (1) the argument cannot be raised on appeal because it was not properly raised below and (2) the substantial factor test has never been applied to negligent investigation and there is no compelling reason to extend the test to such situations. We decline to apply the substantial factor test, but we note that applying the substantial factor test would not alter the conclusions of this opinion.

material information has been presented to the court." *Id.* at 88. Materiality is a question of fact unless reasonable minds could reach only one conclusion. *Id.* at 86.

C. CLARK COUNTY LIABILITY

¶45 Fearghal and CPM/CCM argue that the trial court erred in granting summary judgment in favor of Clark County because Kingrey conducted a negligent investigation of Patricia's allegation of child abuse, which was a proximate cause of his separation from his children. We agree that there is a question of fact regarding whether Kingrey's investigation was negligent, but hold as a matter of law that the no-contact orders issued in Fearghal's criminal proceedings do not constitute "harmful placement decisions" for the purpose of a negligent investigation claim under RCW 26.44.050.[4]

1. Negligent Investigation

¶46 Fearghal and CPM/CCM argue that there is a genuine issue of material fact as to whether Kingrey's investigation was negligent. We agree.

¶47 RCW 26.44.050 describes a law enforcement officer's duty to investigate with broad language and does not "limit the officer's required response to certain specified acts or time periods, but provides a general mandatory duty to investigate." *Rodriguez v. Perez*, 99 Wn. App. 439, 448, 994 P.2d 874 (2000). Whether an officer has fulfilled the duty to investigate is a question of fact. *See Yonker v. Dep't of Soc. & Health Servs.*, 85 Wn. App. 71, 76, 930 P.2d 958 (1997) ("Once a duty is established, whether the defendant breached the duty and whether that breach was a proximate cause of the plaintiff's injuries are normally questions of fact.").

---

[4] Nothing in the record indicates that the superior court protection and restraining orders issued in the dissolution actions were based on Kingrey's investigation. Therefore, our analysis of Clark County's liability focuses only on the no-contact orders issued in Fearghal's criminal cases.

¶48 Here, Kingrey did not meet with Patricia in person, examine CCM for injury, or interview CPM about Fearghal's alleged abuse. Kingrey did interview Fearghal, but there was evidence that he was dismissive and refused to listen when Fearghal told him that Patricia was high on prescription medications the night before, that she had been reporting delusions, and that she was taking medication for anxiety and other mental health issues. Kingrey did not ask Patricia about her prescription drug use or ask her why Fearghal would say she was delusional.

¶49 Fearghal and CPM/CCM also submitted a declaration from Bruce Hall, a retired lieutenant with the Vancouver Police Department. Hall testified that Kingrey's investigation was "rife with many errors, and it displays a predisposition toward arrest that was not warranted under the circumstances." CP at 1852.

¶50 Viewing the facts in the light most favorable to Fearghal and CPM/CCM, we hold that a genuine issue of fact exists whether Kingrey's investigation was incomplete or biased.

### 2. Harmful Placement Decision

¶51 Fearghal and CCM/CPM argue that the no-contact order issued by the district court following Fearghal's arrest was a harmful placement decision, which is required for RCW 26.44.050 liability. We disagree.

¶52 The district court issued the initial no-contact order pursuant to RCW 10.99.040(2)(a), which states:

> Because of the likelihood of repeated violence directed at those who have been victims of domestic violence in the past, when any person charged with or arrested for a crime involving domestic violence is released from custody before arraignment or trial on bail or personal recognizance, the court authorizing the release may prohibit that person from having any contact with the victim.

The question here is whether such a no-contact order issued in a criminal proceeding constitutes a placement decision

for purposes of negligent investigation liability under RCW 26.44.050. This is a question of first impression.

¶53 As discussed above, a harmful placement decision includes "removing a child from a nonabusive home, placing a child in an abusive home, or letting a child remain in an abusive home." *M.W.*, 149 Wn.2d at 602. The only possible placement decision in this case is removing a child from a nonabusive home.

¶54 Two cases have addressed a claim for removing a child from a nonabusive home.[5] In *Tyner*, a DSHS caseworker submitted a declaration in support of a motion for a temporary protective order filed by the plaintiff's wife, in which he recommended that the court prohibit all contact between the plaintiff and his children. 141 Wn.2d at 73. The trial court granted the wife's motion. *Id.* A few days later, DSHS filed a dependency petition that, following a shelter care hearing, resulted in a court order prohibiting all contact between the plaintiff and his children. *Id.* at 74. In *Petcu*, DSHS took the plaintiff's children into protective custody and then filed a dependency petition that resulted in the children being placed with their mother in Portland. 121 Wn. App. at 44-46, 48.

¶55 The courts in *Tyner* and *Petcu* assumed that a harmful placement decision had occurred. *See Tyner*, 141 Wn.2d at 89 (affirming a jury's finding of liability against DSHS when the negligent investigation resulted in court orders limiting contact between a parent and his children); *Petcu*, 121 Wn. App. at 61 (affirming summary judgment in favor of DSHS because there was no proximate cause between the investigation and the court's dependency order). However, both cases involved dependency proceedings specifically designed to determine whether to maintain the parent-child relationship and where the children should

---

[5] In a third case, *Roberson*, the plaintiffs voluntarily relinquished guardianship of their child and claimed that DSHS's conduct had resulted in a "constructive placement" decision. 156 Wn.2d at 46. The Supreme Court held that DSHS had not caused a harmful placement decision. *Id.* at 47.

live. *Tyner*, 141 Wn.2d at 74; *Petcu*, 121 Wn. App. at 48. In both cases, DSHS actually requested a placement decision. *Tyner*, 141 Wn.2d at 74; *Petcu*, 121 Wn. App. at 46. And in both cases, the trial court conducted shelter care hearings to address residency issues. *Tyner*, 141 Wn.2d at 74; *Petcu*, 121 Wn. App. at 46.

¶56 Here, the facts are completely different. The district court's June 6, 2005 no-contact order was issued as a result of a criminal charge, not a dependency petition. The order arose from the district court's arraignment, which was designed to address the criminal charges and not the parent-child relationship. Clark County did not request any placement decision. The district court did not conduct a shelter care hearing or any similar hearing to address residency issues.

¶57 The negligent investigation cause of action based on RCW 26.44.050 is designed to be a narrow exception to the rule that there is no general tort claim for negligent investigation. *M.W.*, 149 Wn.2d at 601. As a result, we interpret the "harmful placement decision" requirement narrowly. *See Roberson*, 156 Wn.2d at 46-47. There is no indication in the limited case law in this area that a no-contact order issued in criminal proceedings that is not designed to address the parent-child relationship and the child's residence can trigger liability under RCW 26.44.050.

¶58 We hold that a "harmful placement decision" for purposes of RCW 26.44.050 negligent investigation liability does not include a no-contact order issued pursuant to RCW 10.99.040(2)(a) at the arraignment of a parent on domestic violence charges. Accordingly, we hold that Clark County cannot be liable for negligent investigation under RCW 26.44.050 and the trial court did not err in granting summary judgment in favor of Clark County on this claim.

D. DSHS LIABILITY

¶59 Fearghal and CPM/CCM argue that the trial court erred in granting summary judgment in favor of DSHS

because Dixson's untimely and negligent investigation of Fearghal regarding the incident with CCM prolonged Fearghal's separation from his children by impeding his efforts to convince the courts to remove the no-contact and restraining orders that were in place. We agree that there is a question of fact regarding whether Dixson's investigation was negligent, but hold that Fearghal failed to show that the investigation was the proximate cause of a harmful placement decision.

1. Dixson Investigation

¶60 Fearghal and CPM/CCM argue that there is a genuine issue of material fact as to whether Dixson's investigation was negligent. We agree.

¶61 Fearghal asserts that Dixson's investigation did not comply with CPS practices and procedures in various ways. He claims that Dixson failed to contact the referring emergency room doctor. And Fearghal asserts that Dixson failed to interview the children within 10 days and instead falsely reported meeting with CPM and CCM on June 13, 2005. Dixson also did not interview Fearghal or even notify Fearghal of his investigation. Nevertheless, Dixson made a "founded" finding regarding Patricia's allegations.

¶62 In addition, there is evidence that Dixson failed to comply with other CPS practices and procedures. For example, Dixson failed to complete his report within 90 days as required by CPS, and he entered his notes into the DSHS records system up to 10 months after conducting his interviews.

¶63 Viewing the facts in the light most favorable to Fearghal and CPM/CCM, we hold that a genuine issue of fact exists whether Dixson conducted a negligent investigation.

2. Proximate Cause

¶64 A successful negligent investigation claim must show that the investigation caused a harmful placement

decision. *M.W.*, 149 Wn.2d at 601. Here, Fearghal and CPM/CCM argue that Dixson's investigation was a proximate cause of the ongoing protection orders against Fearghal in the civil proceedings.[6] They claim that if Dixson had conducted a proper investigation, Fearghal would have been able to use the DSHS investigation to persuade the superior court to stop issuing new protection and restraining orders and to rescind existing protection orders. We hold that Dixson's negligent investigation was not a proximate cause of any harmful placement decision by the superior court.

¶65 Initially, there is no evidence that any court relied on or was aware of the DSHS investigation when making the decision to enter or extend a protection order. Unlike in *Tyner*, DSHS was not involved in Patricia's petition for a protection order in July 2005 or in her subsequent dissolution proceedings, and the superior court was not relying on DSHS for information. Therefore, there was no direct causal connection between Dixson's conduct and issuance of the initial temporary protection order or the subsequent restraining orders issued in the dissolution proceedings.

¶66 Fearghal argues that DSHS caused a placement decision because it failed to present a timely inconclusive finding to the courts. But the facts here are different than those in *Tyner*, where the court affirmed the jury's finding of causation because the caseworker controlled the flow of information to the trial court that entered the no-contact order. 141 Wn.2d at 88-89. The caseworker initially recommended that the court remove the father from the home, but then he failed to inform the court when he ultimately concluded the allegations of abuse were unfounded. *Id.* at 73-74. The court noted that negligence investigation liabil-

[6] Fearghal and CPM/CCM make the same argument regarding the no-contact orders issued in Fearghal's criminal proceedings. But as discussed above, we hold that no-contact orders issued in criminal proceedings are not "harmful placement decisions" for purposes of negligent investigation liability under RCW 26.44.050. Because our ruling above controls the outcome, we do not address this argument in the context of DSHS's liability.

ity arises from the concealment of information or the negligent failure to discover material information. *Id.* at 83-84.

¶67 Here, DSHS did not control the flow of information to the court. First, as noted above and unlike in *Tyner*, DSHS was never involved in the superior court proceedings. And there is no evidence that any court relied on information from DSHS, sought any information from DSHS, or considered the DSHS investigation in any way. Second, there is no evidence that DSHS had any information that was not already in front of the superior court.[7] Third, there is no evidence that an "inconclusive" finding would have caused the superior court to change its decision to issue a protection or restraining order or caused the termination of an existing order.

¶68 Reasonable minds could not conclude that Dixson's negligent investigation was the proximate cause of the superior court's protection and restraining orders. Accordingly, we hold that DSHS cannot be liable for negligent investigation under RCW 26.44.050 and that the trial court did not err in granting summary judgment in favor of DSHS on this claim.

E. Vancouver Liability

¶69 Fearghal and CPM/CCM argue that the trial court erred in granting summary judgment in favor of Vancouver because although a prosecutor generally is immune from liability, Petty lost her immunity when she stepped outside of her role as prosecutor and took an investigative role in Fearghal's case. We disagree.

1. Prosecutor's Liability/Immunity Under RCW 26.44.050

¶70 RCW 26.44.050 states that a "law enforcement agency" must investigate a report of child abuse. Prosecut-

---

[7] DSHS notes that it was Fearghal who provided the information that caused its "founded" finding to be amended to "inconclusive," and argues that he likely communicated that information to the courts as well.

ing attorneys fall within the definition of "law enforcement agency." Former RCW 26.44.020(2) (2000). Therefore, Vancouver potentially is subject to liability for negligent investigation under RCW 26.44.050.

¶71 However, prosecutors generally have absolute immunity for initiating and pursuing a criminal prosecution. *Musso-Escude v. Edwards*, 101 Wn. App. 560, 570, 4 P.3d 151 (2000). Absolute immunity means that a prosecutor is shielded from liability even when he or she engages in willful misconduct. *Id.* at 568. This immunity is warranted to protect the prosecutor's role as an advocate because any lesser immunity could impair the judicial process. *Id.* at 573.

¶72 But a prosecutor's absolute immunity applies only to those actions within the scope of traditional prosecutorial functions. *Rodriguez*, 99 Wn. App. at 450. A prosecutor is subject to liability under RCW 26.44.050 if he or she "engages in functions outside the scope of prosecutorial duties." *Id.*

> "There is a difference between the advocate's role in evaluating evidence and interviewing witnesses as he prepares for trial, on the one hand, and the detective's role in searching for the clues and corroboration that might give him probable cause to recommend that a suspect be arrested, on the other hand. When a prosecutor performs the investigative functions normally performed by a detective or police officer, it is neither appropriate nor justifiable that, for the same act, immunity should protect the one and not the other."

*Id.* (internal quotation marks omitted) (quoting *Gilliam v. Dept. of Soc. & Health Servs.*, 89 Wn. App. 569, 583, 950 P.2d 20 (1998)).[8]

2. Petty's Immunity

¶73 The question here is whether Fearghal and CPM/CCM have presented sufficient evidence that Petty took

---

[8] *Gilliam* quotes *Buckley v. Fitzsimmons*, 509 U.S. 259, 273, 113 S. Ct. 2606, 125 L. Ed. 2d 209 (1993).

investigative actions outside the scope of her duties as a prosecutor to create a genuine issue of material fact. If so, absolute immunity does not apply. But if Petty did not exceed the scope of her duties as a prosecutor, then absolute immunity shields her from the claim.

¶74 Fearghal and CPM/CCM rely on various allegations by Patricia regarding her interactions with Petty. First, in the lengthy "Stipulation to Findings of Fact" written and signed by Patricia and Fearghal in 2008 for the family court, Patricia alleges that she initially expressed reluctance about pursuing Fearghal's prosecution. Patricia claims that Petty told her that (1) it was not Patricia's decision to drop charges, (2) Fearghal fit the profile of a typical abuser, (3) Patricia fit the profile of a typical domestic violence victim, (4) Petty was outraged by the police report, (5) Patricia should be fearful of Fearghal, (6) Patricia would lose credibility in any divorce action if she recanted, which would likely result in her losing custody, (7) if Patricia recanted, Petty would notify CPS, which would take the children from Patricia and put them in foster care, and (8) if Patricia recanted she would be prosecuted for making a false police report. Patricia also alleges that Petty told her to file for divorce and to petition for an order of protection that would remove Fearghal from the home and prohibit his contact with the children.

¶75 However, Petty allegedly made each of these statements while conferring with Patricia, a witness, in preparation of her case against Fearghal. Conferring with potential witnesses is within the scope of a prosecutor's traditional duties. *Rodriguez*, 99 Wn. App. at 450. The fact that Petty's conduct allegedly was improper or wrongful is immaterial to the question of whether immunity applies.

¶76 Second, Patricia alleges that Petty told her that she needed more charges against Fearghal to strengthen her case and enable her to convict and deport Fearghal. Petty told Patricia to obtain and bring to her fitness club records to show that Fearghal had violated the no-contact order by

going to a fitness club when Patricia was there with the children. Then Petty directed Patricia to report the violation. Fearghal and CPM/CCM argue that this conduct involved case investigation and fact-finding that is outside the prosecutor's function.

¶77 Again, these allegations do not indicate that Petty acted outside her scope as a prosecutor. Her actions in asking for the fitness club records and directing Patricia to report no-contact order violations are related to her duty to make charging decisions. The charging function is intimately related to the judicial process, and prosecutorial immunity must apply to ensure the independence of the decision-making process. *Hannum v. Friedt*, 88 Wn. App. 881, 886-87, 947 P.2d 760 (1997).

¶78 Third, Patricia alleges that Petty strategized with Patricia's dissolution attorney regarding dissolution matters. But Patricia admits that she was not part of any conversations between her dissolution attorney and Petty and that her knowledge of them is based only on her dissolution attorney's hearsay statements to her. And Patricia's dissolution attorney stated in her deposition that she talked to Petty once and asked her if she wanted to cooperate with the divorce, but Petty said no. As a result, there is insufficient evidence to create a genuine issue of material fact regarding whether Petty injected herself into the dissolution proceedings.

¶79 Finally, Patricia alleges that during her deposition in September 2009, Petty met with her in the bathroom during breaks to give her instructions on what to say. However, we need not consider whether Petty coaching Patricia during a deposition falls outside the scope of Petty's immunity. Fearghal and CPM/CCM filed their complaint in January 2009, months before these events allegedly occurred. They did not take any action to incorporate these allegations into their complaint. Therefore, they cannot use the events surrounding the September 2009 deposition to support their claim here. Further, Petty left the Vancouver

City Attorney's Office in early 2006. As a result, Petty's conduct at the September 2009 deposition was outside her scope of employment with Vancouver and could not subject Vancouver to liability.

¶80  Even viewing all of the facts alleged by Fearghal and CPM/CCM in the light most favorable to them, there is no genuine issue of material fact whether Petty stepped outside of her role as prosecutor. Accordingly, we hold that Petty is entitled to absolute prosecutorial immunity and that the trial court did not err in granting summary judgment in favor of Vancouver on this claim.

## CONCLUSION

¶81  Clark County, DSHS, and Vancouver are not subject to negligent investigation liability under RCW 26.44.050. We consider and reject Fearghal's and CPM/CCM's remaining claims in the unpublished portion of this opinion. Accordingly, we affirm the trial court's grant of summary judgment in favor of Clark County, DSHS, and Vancouver on all claims.

¶82  A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder shall be filed for public record in accordance with RCW 2.06.040, it is so ordered.

WORSWICK and JOHANSON, JJ., concur.

Motions for reconsideration denied May 17, 2016.

Review denied at 186 Wn.2d 1018 (2016).